Filed 5/22/14  In re S.L.CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064635 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J518534B-C) |
| RAMON L. et al., | |
| Defendants and Respondents; | |
| S.L. et al., | |
| Appellants. | |
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064942 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. J518534B-C) |
| RAMON L. et al., | |
| Defendants and Respondents; | |
| MARTHA L., | |
| Movant and Appellant, | |
| S.L. et al., | |
| Appellants. | |

CONSOLIDATED APPEALS from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Appellants, Minors.

Martha L., in pro. per., for Movant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Respondent Ramon L.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Respondent Miriam H.

S.L., born in 1999, and Jose L., born in 2002 (collectively, the children), are minor children of Ramon L. and Miriam H. The children appeal orders granting Ramon's petitions under Welfare and Institutions Code section 388[1] to remove them from the custody of their half sister Martha L., and an order denying Martha's application for de facto parent status. Martha also filed a notice of appeal from the order denying her application for de facto parent status and joins in the children's opening brief. We granted the children's unopposed motion to consolidate the appeals. The children contend the juvenile court abused its discretion in granting Ramon's section 388 petitions and removing them from Martha's custody, and in denying Martha's application for defacto parent status. We affirm.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

On October 8, 2012, when Jose and S.L. were living with Ramon, Martha called the police to report that Jose was left at home alone. When police officers arrived at the home at 5:45 p.m., Jose told them he had been home alone since 4:30 p.m. and that he burned his right foot when he took a cup of hot noodles out of the microwave and spilled some on his foot. He said his older sister W.L., born in 1997,[2] was supposed to pick him up after school but did not, so he decided to walk home. The police took Jose to the police station, where he met Martha and S.L. He and S.L. were later admitted into Polinsky Children's Center (PCC).

When social worker Jorge Nunez from the San Diego County Health and Human Services Agency (the Agency) interviewed S.L. and Jose at PCC the next day, they said they preferred living with their adult sister Martha and stayed with her about four nights a week due to Ramon's work schedule. S.L. said Ramon was not meeting their needs and she had to beg him to buy food and clothing for them. She also stated that about three years earlier, she saw Ramon put his hands inside W.L.'s pants and grab her buttocks. She said Ramon had a drinking problem and tried to be inappropriate with her when he got drunk, and had tried to tickle her around her waist and on her buttocks over her clothing.

Jose told Nunez that he witnessed Ramon put his hand inside W.L.'s pants to touch her buttocks about five months earlier. He said he was left home alone once about a year ago but had not been left alone any other time. He knew Ramon drank alcohol because he saw beer in the refrigerator, but had never seen him drink or seen him drunk. He said he would like Ramon to change because Ramon drank beer and did not get along with Martha.

_____

[2] W.L. was also a dependent of the court in the proceedings below, but is not a party to this appeal.

Nunez met with W.L. at her high school. She told him that she had not picked Jose up after school because he told her he was going to Martha's home. She did not think twice about it because Jose and S.L. had been staying with Martha regularly. She said that the allegations about the inappropriate touching by Ramon were untrue. She believed Jose and S.L. said it happened because they thought she was in trouble and needed help. She did not feel that Jose and S.L. were in any danger at home. She acknowledged that Ramon drank beer but did not believe it limited his ability to take care of them. W.L. later told a police investigator that two years earlier Ramon had touched her on her butt, and that it he did it only one time. She said she was sometimes afraid of Ramon when he got drunk and that she noticed his "temptations" and kept her distance.

The next day the child abuse hotline received a report that the police had taken W.L. to PCC due to sexual abuse. Nunez met with W.L. at PCC and she told him the police came to her home the night before to ask her about sexual abuse allegations and took her to PCC after she disclosed some information. She told Nunez she was not comfortable giving him details. When asked if the allegations were true, she said "something like that happened" and that it was a onetime incident, but did not elaborate further. She felt that her father's home would be a good place for her and her siblings as long as he got help with his drinking. She thought that Martha's home would be a bad placement for her because she did not get along with Martha.

On October 10, 2012, the Agency filed petitions on behalf of S.L. and Jose under section 300, subdivision (b), alleging they were at substantial risk of harm as a result of the parents' failure to adequately supervise or protect them. The petitions further alleged that the children were found alone and were detained by the police, and that efforts to contact the parents had been unsuccessful. At a detention hearing held on October 11 and 12, 2012, the Agency requested that the petitions be dismissed and the children's counsel opposed the request. The court set an order to

4

show cause (OSC) hearing on the matter for October 19, 2012. The court ordered Jose detained with Ramon and S.L. detained with Martha.

On October 16, 2012, the child abuse hotline received a report that S.L. and Ramon had gotten into an argument about S.L.'s returning home, and that Ramon slapped S.L. and pulled her hair and arm. Nunez interviewed Jose about the incident. Jose told him he had spent the night at Martha's house with Ramon's consent, and was asleep there with S.L. Martha was not there when Ramon came over the next morning because she was out jogging. Ramon entered the house without knocking and told the children to get ready for church. S.L. refused and began to argue with Ramon. Ramon told her that the court did not prohibit her from going to church with him and that he was going to take her home with him as well. He grabbed her by the hair and pulled it once, and then grabbed her by the arm. S.L. resisted and he slapped her across the face once. Jose told him to leave S.L. alone. Ramon and Jose then left and went to Ramon's home.

According to S.L., she was asleep at Martha's house when Ramon walked in and told her she needed to go back home with him. Ramon was upset and yelling throughout the incident. She refused to go with him so he grabbed her by the hair and dragged her by the arm, and then slapped her across the face twice. He left with Jose and she went to a neighbor's house. Martha arrived shortly after Ramon and Jose left. S.L. told Nunez she was afraid of Ramon and that her cheek was swollen.

On October 18, 2012, a police officer questioned S.L. after receiving a call regarding possible child abuse. S.L. told the officer she went to see Jose at his elementary school, where Ramon was picking him up. In Ramon's presence, she told Jose to call her as soon as he got home and to call the social worker if anything happened. Ramon mocked her by repeating what she said to Jose and then slapped her on the left side of her face with his right hand.

5

At the OSC hearing on October 19, 2012, the Agency withdrew its request to dismiss the petitions. The court removed the children from Ramon's custody and ordered them detained. The Agency placed them with Martha.

On October 31, 2012, the Agency filed amended petitions alleging under section 300, subdivision (b), that Ramon used alcohol to excess and did not provide food, clothing, and other necessities for the children because he bought alcohol, and that he had touched W.L. on the buttocks under her clothing. The petition concerning S.L., also included allegations under section 300, subdivision (a), that Ramon had slapped her on the face on two occasions and had dragged her by the arm and attempted to drag her by kicking her with his knee; and allegations under subdivisions (d) and (j) that Ramon had touched W.L. on the buttocks on more than one occasion over the course of two years and tried to tickle S.L. and move his hands towards her buttocks. At a detention hearing on November 1, 2012, the court authorized the children's continued detention with Martha and found a prima facie showing had been made under section 300, subdivisions (a), (b), and (j) as to S.L., and under subdivision (b) as to Jose.[3] The court set the matter for trial on behalf of both parents. As to Ramon, the issues for trial were the truth of the allegations in the petitions and disposition. As to Miriam, the issue for trial was placement with her.

The Agency's jurisdiction/disposition report prepared by social worker Vilma Martinez included summaries of Martinez's interviews of the children and Ramon. S.L. said that her mother (Miriam) sold marijuana in Tijuana, Mexico, when S.L. was in her care and that she would not feel safe with Miriam in Tijuana. She thought it was worse now at Miriam's house because Miriam's current boyfriend was in a gang and said to be the boss of drug dealers. When asked if she was

_____

[3] W.L. opted out of being placed with Martha because of their strenuous relationship. She was placed with a nonrelative extended family member.

6

aware of the "case about her sister [W.L.]," S.L. said that Ramon was touching W.L. and that W.L. needed to tell the truth and needed therapy. She said Ramon kept denying everything and needed to figure out what he was doing wrong.

Jose said that he did not want to return to Ramon's care but would like to visit him. He felt uncomfortable with Ramon because Ramon left them alone and people would peek through the windows. He said Ramon got upset with Martha because she would pick them up when Ramon wanted them to go to his Jehovah's Witnesses church with a neighbor. Jose did not want to go to Ramon's church because he did not share its beliefs. Jose saw Ramon touch W.L. three or four times.

Ramon denied slapping S.L. at Martha's house. He said he just attempted to lift her off the bed and she threw herself on the floor. He put his arms under her underarms to pick her up and her hair got stuck under a chair or sofa. He did not hit her in the face; he cupped his hands around her face to get her to look at him. He also denied slapping her at Jose's school. He said S.L. ran in front of him as Jose was walking toward them and he just attempted to push her back.

Ramon denied that he had ever touched W.L. inappropriately. He said that every day when W.L. came home from school, he hugged and kissed her to show his parental love as his church had taught him. Regarding S.L.'s and Jose's allegations of inappropriate touching, he said W.L. had entered the home through the front door and while he had his arms around her to hug her, Jose and S.L. came in through the back door and misinterpreted what he was doing. He denied the children's allegations that he and W.L. were lying down when the alleged touching occurred. He believed that Martha told the children to make up the allegations. He did not believe he had ever made W.L. feel uncomfortable or that she had misinterpreted his love towards her.

7

Ramon also denied the children's allegations that he failed to provide for them, stating he worked as a cook and always made sure there was food in the home already prepared for them. He believed that the children made those allegations to appease Martha and that Martha directed the children to make them because she was upset about him not wanting her to have contact with the children. He said he drinks only once in a while when his oldest son visits and brings a couple of beers. He used to drink and smoke cigarettes frequently but quit doing so about eight years ago with the help of his church

Ramon wanted the children placed with members of his church or PCC instead of Martha if they could not be placed with him. He stated Martha "puts things" in the children's heads and did not want the children to go to his church; she wanted them to follow her faith or lack thereof. He thought Martha just wanted the children so she could get financial aid from the Agency and prove her independence. Jose and S.L. said they wanted to stay with Martha because she was responsible and bought them clothes and took them out. Jose added that Martha did not leave them home alone.

Social worker Martinez's assessment was that Ramon and Martha's relationship affected the children, and that all parties involved needed to learn to work together for the children's well-being. Both Ramon and Martha were informed that if the children's placement conflicted with the goal of reunifying them with Ramon, they could be moved.

In an addendum report prepared for a pretrial settlement conference on January 3, 2013, the Agency recommended that the children not be returned to their parents' care. Miriam had disclosed a criminal record with "some type of drug history/involvement" and had not parented the children for years. The children did not feel safe in her care and refused visitation with her, and they did not want to go to school in Mexico. Martinez had been unable to interview Miriam

8

because she had not made herself available despite Martinez's numerous efforts to contact Miriam. Ramon was participating in all of the services in his case plan, but the children continued to refuse visitation with him. They said they wanted him to continue in his services so they could trust him and feel safe with him. Jose and W.L. wanted to make progress in their own therapy to deal with conflicting feelings about their parents before beginning visitation.

At the pretrial hearing on January 3, 2013, the court sustained the children's petitions and made true findings on the counts under section 300, subdivisions (a) and (b) in S.L.'s petition and subdivision (b) in Jose's petition. The court dismissed the count under subdivision (j) in S.L.'s petition. The court removed the children from parental custody, ordered supervised visitation with the parents, and continued their detention in an approved home of a relative pending placement. The Agency continued their placement with Martha.

In May 2013, Ramon requested a special hearing "[t]o bring to the court's attention [Martha's] role in obstacles to visitation and request changes in visitation plan: additional visits and therapeutic setting should be offered to the family." The Agency prepared an addendum report for the special hearing, which was set for May 8, 2013. The report noted that S.L. and Jose had refused visits since they were removed from Ramon's care whereas W.L., who was placed in the home of a nonrelative, had visited the parents consistently.

The Agency reported that Martha had not facilitated in helping visitation with the children and that the Agency believed she may be "sabotaging reunification services." Although Martha lately had been more receptive to aiding the reunification process, the Agency thought it was likely she did not encourage the children to attend visits even though she said otherwise. She had recently said her main concern was that the children would return to Ramon's care and she would not be able to see them again. The Agency believed removing the children from Martha's care

9

would cause them trauma and was "conflicted in assessing whether removal . . . would remove the barrier of the children visiting with their parents."

Martha complained that social worker Martinez had been rude to her and the children and was "useless," and that the children refused to speak to Martinez during monthly in-person visits. The Agency's assessment was that when Martha had issues with a person, the children followed her lead. Therefore, "in a last attempt to not remove the children from [Martha's] care, the Agency assigned the family a new [social worker (Hazael Lopez) on April 17, 2013]."

Martinez had arranged and asked the children to attend numerous visits with their parents and with W.L., and had attempted to work with Martha in enrolling the children in therapy and making sure they had physical and dental examinations. Martha said it was too much and shortly thereafter, the children did too. W.L. attended all visits arranged for her with both her siblings and her parents. She became upset and cried when Martha did not bring the children to the visits with her. W.L. believed the children cancelled the visits because she and Martha did not get along. She said Martha previously tried to convince her that her parents were not good people. She and Martha stopped getting along when she stopped listening to Martha. She believed Martha was influencing the children to refuse visitation with her and the parents.

The Agency's conclusion that Martha had not helped facilitate visitation and may be sabotaging reunification services was based, among other things, on a number of reported incidents where Martha failed to answer or return calls from Martinez to set up visits, which required Martinez to seek the help of the children's counsel; the children's continued refusal to visit Ramon, even when Martha brought them to the visitation center; Martha's unwillingness to transport the children to sibling visits; the children's stating they did not want to be pulled out of school 10 minutes early to be transported to visits on Friday when the visitation center could not

provide a later pick up time; and the visitation center's decision to cancel sibling visits because it could not accommodate Martha's schedule and she refused to transport the children.

Because of the continued difficulties in working with Martha and the children's failure to attend scheduled visits with W.L. and Ramon, the Agency scheduled a team decision meeting (TDM) to discuss the importance of Martha's aiding in the reunification process and maintaining communication with the social worker. Although Martha twice confirmed in a telephone conversation with social worker Lopez that she would attend the scheduled TDM, she did not show up at the meeting. When Lopez called Martha, she said she missed the meeting because she had two other scheduled appointments that she "forgot" about when she confirmed she would attend. Lopez rescheduled the meeting for the next day and Martha confirmed she would attend at the scheduled time or would call Lopez if she could not attend. Lopez told her that her attendance was crucial. However, Martha arrived at the meeting about 30 minutes late and said she could only stay about another 30 minutes because she had other engagements.

At the TDM it was explained to Martha that it was important she transport the children to each scheduled visit; that the court ordered reunification services for the parents and it was the Agency's duty to provide those services; that visitation was a crucial part of the services; that the children would not be forced to visit Ramon, but they needed to be brought to the scheduled visits and asked if they wanted to visit; and that if she did not comply with the Agency, the Agency would have no choice but to inform the court. Martha was also told that the Agency did not want to remove the children from her home and the purpose of the TDM was to attempt to prevent their removal, but there may be no other option if she continued to not work with the Agency.

Following the TDM, Martha cancelled the children's next scheduled visit with W.L., stating the children had to attend ceremonies at school. However, the children's schools informed the

11

Agency that the ceremonies in question took place during school hours and later in the evening, which would have allowed time for the visit. W.L. was upset by her siblings' failure to visit her and believed it was because of Martha. Martha also failed to bring the children to a scheduled visit with Miriam. When Miriam later telephoned Martha to talk to the children, Martha discussed the sexual abuse allegations against Ramon with her in the children's presence.

Ramon told Lopez that he wanted the children removed from Martha because he had not seen any progress with them, whereas he had seen significant improvement with W.L., who had been visiting him. He felt that as long as the children were with Martha, he would never see them. He told Lopez he had been trying to contact the children by telephone, but Martha did not pick up his calls. The Agency noted that at the TDM, Martha had agreed to accept phone calls from Ramon and said she had no problem with him calling to speak to the children.

The children arrived at the next scheduled visit with Ramon, but refused to visit with him. When asked why they did not want to see their father, neither S.L. nor Jose gave a reason. S.L. began to cry and said she was not ready to forgive Ramon. The children told Lopez that Ramon had not called or attempted to see them in almost five months. When Lopez told the children Ramon had been calling and coming to the visitation center every week to see them, they said they still did not feel ready to see him, but would be willing to take a letter from him. They said they did not think he had changed. Lopez responded that although he would not force them to visit Ramon, the only way they could find out if Ramon had changed was to talk with or visit him.

Ramon wrote letters to the children and they wrote back, but continued to say they were not ready to see him in person. Martha told Lopez that the children did not want to visit Ramon because they were emotionally hurt, which she knew because Ramon had emotionally abused her as a child. Lopez told Martha that Ramon was participating in services, including parenting

12

classes to learn about his past mistakes and to parent the children in the future. Martha said Ramon was a "fake" and would never change and that he used to drink, do drugs, and beat the children. She said she would not allow the children to visit Ramon until she saw a "genuine" change in him. Lopez reminded Martha that she was not the person who determines who can visit the children and that there was a court order allowing Ramon to have supervised visitation with them. Lopez told Martha he did not believe it was beneficial for the children's well-being that they had not seen Ramon in five months. Martha responded that it was the children who were refusing to see Ramon and she was protecting them.

W.L. told Lopez that Jose and S.L. would never see her or her parents as long as they were living with Martha, and that Martha was abusive and manipulative and always talked bad about Ramon and Miriam. She said Ramon used to be very strict and had anger issues, but she had seen a change in him since she had been visiting him. When asked what change, W.L. cried and said, "He is more sensitive now and he tells me that he loves me and cares for me. He never said that to me before."

On May 8, 2013, the court continued the special hearing to June 5, 2013, and ordered: "The caregivers are admonished by the court to work with the social worker, the minor[s] and minor[s'] parents regarding visitation, and [the court] requests that all work together to meet the goals of the court."

In an addendum report for the June 5 hearing, the Agency reported there had been "little to no change" regarding visits between the children and Ramon or Martha's cooperation with visitation since the May 8 hearing. Ramon had written the children two letters expressing his feelings toward them and the children had written back. However, their letters contained statements "that appeared to be of an adult matter." The children mentioned property that Ramon

13

owned in Mexico and questioned why he was not selling the property and why he was not giving Martha money. Although the children were open to receiving phone calls from Ramon and he had been calling every Thursday and Friday, social worker Lopez observed that the children lacked interest in Ramon's letters and the supervised telephone calls had lasted only a couple of minutes.

Lopez supervised a telephone call that was put on speakerphone. When Ramon greeted S.L., she immediately said, "I don't want to talk to you because you misbehaved at court on Wednesday." S.L. then passed the phone to Jose. After Ramon and Jose exchanged greetings, Ramon asked Jose what he was doing. Jose said, "I don't want to talk to you[;] I'm doing my homework." Ramon told Lopez it was the same result every time he called the children. He said, "They are always rude and direct . . . [b]efore they lived with Martha they never acted this way."

Lopez made several calls to Martha to attempt to schedule another TDM, but Martha said she could not attend because she was busy with other appointments. She was inflexible and her tone was discourteous. Martha finally agreed to a meeting date after Lopez told her she was being inflexible and reminded her that the court made it clear she needed to work with the parents and the social worker. However, it took several weeks to organize the TDM, mostly due to Martha's inflexibility and unwillingness to cooperate.

In a second addendum report for the June 5 hearing, the Agency reported that one day before the TDM, social worker Lopez reminded Martha of the meeting and Martha confirmed that she would attend. On the day of the meeting, Lopez again contacted Martha to remind her of the meeting and Martha said she would be there. However, she arrived about 30 minutes late for the meeting. Lopez informed Martha that the meeting had been cancelled due to her tardiness. Martha did not ask to be heard or make an excuse for her tardiness; she simply stood up and said, "Ok, I'm leaving now."

14

On May 10, 2013, Martha brought the children to a scheduled visit with Ramon and W.L. 35 minutes late. S.L. told Lopez to "make it quick because we are going out with Martha." When Lopez asked her why they made plans to go out on a day and time reserved for visitation, S.L. did not answer. Lopez then asked S.L. if she wanted to visit Ramon. She said she wanted to be present at the next court hearing so she could tell the judge that she did not want anything to do with her father.

Lopez asked Martha why she had planned an outing with the children on the day and time reserved for visitation with W.L. and Ramon. Martha said she scheduled the outing because the children told her they would not be meeting with Ramon. Lopez told Martha she should not make plans during the time of visitation, noting that S.L. asked to accelerate the visitation because she wanted to go on her outing. Lopez informed Martha that by planning the outing, she was impeding Ramon's reunification services.

The Agency reported that it was seriously contemplating removing the children from Martha's home. W.L. had benefitted from living in a neutral setting and was consistently visiting Ramon, whereas S.L. and Jose had not been willing to meet with their parents since being removed from Ramon in December 2012. The Agency's assessment was that Martha had made up her mind Ramon was not a fit father and would never change, and she negatively influenced the children. The children were well aware how Martha felt about Ramon and, like Martha, they said Ramon would never change. The Agency believed that even if the children wanted to visit with Ramon, as long as they were placed with Martha they would never feel safe to admit it for fear of her reaction. The Agency concluded that the placement with Martha was not a neutral setting where the children could express anything positive about visitation or reunification with Ramon.

15

At the special hearing on June 5, 2013, Ramon's counsel informed the court that she would be filing section 388 petitions on behalf of Ramon. The court stated it would hear the petitions on the same day as the six-month review hearing. The court's minute order from the June 5 special hearing stated: "The court admonishes all parties regarding the importance of visitation and the court's ultimate goal of reunifying parents with their children; as stated on the record. The court orders the visitation to remain as it was previously set and stresses to all parties that the court will look unfavorably upon anyone that makes any effort to block or subvert the court's order regarding visitation."

A report prepared for the six-month review hearing, stated: "At the time of this writing, the Agency does not recommend that the children be returned home with their parents, however, it is [social worker] Lopez's professional opinion and the Agency's assessment that [S.L.] and Jose would benefit from a change of placement and should be placed in a neutral setting in which the children's parents are not poorly spoken of and where encouragement regarding reunification services is provided to the children. It is the Agency's assessment that the children are being placed in a complicated situation as they seem to find it difficult to be loyal to either the father or [Martha] as the children appear unsettled and confused. It is the Agency's assessment that as long as the children remain living and placed with [Martha], reunification will continue to be interfered with."

On June 25, 2013, Ramon filed section 388 petitions requesting that the children be removed from Martha's care. In an addendum report prepared for a pretrial settlement conference set for July 17, 2013, the Agency recommended that S.L. and Jose be placed in a licensed foster home and that the Agency have discretion to place them in the approved home of a nonrelative extended family member. The Agency had cleared and approved the home of Ramon's friend for

16

the children's placement. The children said they would not be comfortable being placed with a friend of their father and would rather be placed in a foster home.

At the hearing on July 17, 2013, the court found Ramon had made a prima facie showing on his section 388 petitions. The court set an evidentiary hearing on the petitions to be held on the day of the contested six-month review hearing.

The contested six-month review hearing and section 388 hearing took place over several days in August and September 2013. The court considered all of the Agency's reports and heard testimony from the children's therapists, the children, Martha, and social worker Lopez. On September 16, the final day of the hearing, the court granted Ramon's section 388 petitions and removed the children from their placement with Martha.

Martha submitted an application for de facto parent status at the September 16 hearing. The court set a hearing on Martha's application and returned the application to her so she could properly serve it on all parties. On November 7, 2013, the court held a hearing on Martha's application and heard testimony from Martha. After taking the matter under submission, the court denied the application as to both children.

### DISCUSSION

#### I. *Ramon's Section 388 Petitions*

The children contend the court abused its discretion in granting Ramon's section 388 petitions and removing them from Martha's care.

"Section 388 allows a parent or other person with an interest in a dependent child to petition the juvenile court to change, modify, or set aside any previous order. (§ 388, subd. (a).) 'Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' [Citations.] The petitioner has the burden of showing by a

17

preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child. [Citations.] That is, '[i]t is not enough for [the petitioner] to show just a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615, italics omitted.) "In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case." (*Id.* at p. 616.) We review a juvenile court's order granting or denying a section 388 petition for abuse of discretion. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.) We will not disturb the juvenile court's decision "unless that court has exceeded the limits of judicial discretion by making an arbitrary, capricious, or patently absurd determination." (*In re E.S.* (2011) 196 Cal.App.4th 1329, 1335.)

The critical issue the court had to decide in ruling on Ramon's section 388 petitions was whether the children's placement with Martha was undermining the reunification process mandated by California's juvenile dependency scheme. "It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system. With but few exceptions, whenever a minor is removed from parental custody, the juvenile court is required to provide services to the parent for the purpose of facilitating reunification of the family. [Citation.] Each reunification plan must be appropriate to the parent's circumstances. [Citation.] The plan should be specific and internally consistent, with the overall goal of resumption of a family relationship. [Citations.] The agency must make reasonable efforts to provide suitable services, 'in spite of the difficulties of doing so or the prospects of success.' [Citation.]

"Among its components, the reunification plan must include visitation. [Citation.] That visitation must be as frequent as possible, consistent with the well-being of the minor. [Citation.]

Absent a showing of detriment caused by visitation, ordinarily it is improper to suspend or halt visits even after the end of the reunification period. [Citations.] Visitation may be seen as an element critical to promotion of the parents' interest in the care and management of their children, even if actual physical custody is not the outcome." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 678-679.)

We conclude the court acted well within its discretion in granting Ramon's section 388 petitions on the ground Martha was frustrating the statutory goal of family reunification by influencing the children to refuse visitation. The court reasonably found by clear and convincing evidence that Ramon met his burden of showing changed circumstances. The court cited evidence that Ramon had not seen the children in visitation during the entire eight-month period they had been in Martha's care; the children had persistently refused to see Ramon and had refused to get in the car when the social worker came to transport them to visitation; and they had consistently refused to engage in any meaningful conversation with him when he called them by phone. The court found there had been "an alarming number of irregularities involving Martha . . . [pertaining] to visitation[,]" including the fact that although she was the caretaker responsible for promoting reunification, she had "not had a true conversation with her father since the case began."

The court noted that Martha's lack of cooperation with the first social worker assigned to the case caused the Agency to assign a new social worker to the case, but the second social worker had "not been able to work with her on important issues and problems such as the issue and problem of visitation." The court found that Martha had "persistently expressed her negative and hostile feelings to the social workers involved in the case." The court also found there had been significant problems with the children's visitation with W.L. that were "directly assignable to . . . Martha[,]" and that as W.L. was making "positive strides toward reunifying with the

19

father, . . . Martha . . . continue[d] to be unable and unwilling to comply with the full scope of the visitation order."

The court found that Martha influenced the children's thoughts about visitation with Ramon. The court viewed the children's testimony about visitation as reflecting "an adult strategy of permanently blocking the visitation. It went like this: 'We won't see the father at all. When he calls, we'll just hang up. When we're asked why we hung up, we'll just say we didn't like what he had to say,' thus they're effectively eliminating any avenues to visitation. [¶] But then to appease the court, they testify, 'But you know what? Telephone calls are an important first step toward actually seeing our father,' meaning 'we won't have any good telephone calls' but that's somehow an important step toward seeing their father."

The court noted that when Martha testified, she admitted that Ramon's calls to the children were a "disaster"; however, she then "used the exact same language that the kids used, 'But the telephone calls were an important first step leading to face-to-face visitation.'" The court concluded that Martha "has either directly or indirectly influenced the refusal of [the children] to visit their father. She has not promoted or assisted this visitation. Her involvement as caretaker for [the children] represents a significant impediment towards successful reunification between these children and their father."

Regarding the children's best interests, the court acknowledged the positive aspects of Martha's care of the children, and that the children would suffer "some degree of trauma" if removed from Martha. However, the court viewed Martha's negative attitude toward the children's visitation with Ramon as being "totally contrary to the basic assumptions underlying the dependency system. It does not promote visitation; it is not consistent with reunification. If visitation and reunification are in the best interest of the children, then this placement with

20

Martha . . . is not."  Thus, the court found that the children's placement with Martha did not promote the overall goal of visitation as an integral component of the reunification process.  The court concluded:  "[A]t this point in time the placement with Martha . . . is inconsistent with even the short-term analysis of best interest, and it's much more inconsistent with the long-term analysis of best interest.  [¶] Consequently, the court concludes by clear and convincing evidence that it is in the best interest of [the children] to be removed from the care of Martha . . . ."

The court's finding that removal of the children from Martha's care was in their best interests because Martha was subverting the statutorily-mandated reunification process was amply supported by the Agency's reports and social worker Lopez's testimony regarding Martha's negative attitude toward Ramon and her lack of cooperation with the Agency, particularly with respect to visitation.  The children's and Martha's testimony further supported the court's finding that Martha had negatively influenced the children's attitude toward visitation.  The court's determination that circumstances had changed and removal of the children from Martha's care was in the children's best interests was not an arbitrary, capricious, or patently absurd determination that exceeded the limits of judicial discretion.  (*In re E.S., supra,* 196 Cal.App.4th at p. 1335.)

## II.  *Martha's Application for De Facto Parent Status*

The children contend the court abused its discretion in denying Martha's application for de facto parent status.  We find no abuse of discretion.

" ' "De facto parent" means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period.' [Citation.] 'On a sufficient showing the court may recognize the child's present or previous custodians as de facto parents and grant standing to participate as parties in disposition hearings and any hearing

21

thereafter at which the status of the dependent child is at issue. The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, by appointed counsel; and [¶] (3) Present evidence.' (Cal. Rules of Court, rule 5.534(e).)

"A determination of whether or not a person qualifies as a de facto parent is a fact-based assessment, and '[t]he decision to grant de facto parent status depends on an assessment of the particular individual and the facts of the case.' [Citation.] Factors courts generally consider in making this assessment include (1) whether the minor is psychologically bonded to the adult; (2) whether the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) whether the adult possesses information about the minor unique from other participants in the process; (4) whether the adult has regularly attended juvenile court hearings; and (5) whether any proceeding may result in an order permanently foreclosing any future contact between the adult and the child." (*In re R.J.* (2008) 164 Cal.App.4th 219, 223.)

"The denial of a petition for de facto parent status is reviewed for abuse of discretion. [Citation.] 'In most cases, the lower court does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status.' " (*In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.)

In its oral ruling denying Martha's application, the court incorporated by reference its oral ruling granting Ramon's section 388 petitions. The court explained that in light of its decision that the children's placement with Martha was detrimental to them and not in their best interests, it would be inconsistent to grant Martha de facto parent status. Specifically, the court stated that granting Martha de facto parent status made no "logical sense" or "legal sense" in light of its ruling and the facts it had found regarding "impediments to appropriate visitation and appropriate attitude of the [children] toward their father as influenced by [Martha] either directly or indirectly."

The court analogized this case to *In re Michael R.* (1998) 67 Cal.App.4th 150 (*Michael R.*), in which the appellate court upheld the juvenile court's denial of de facto parent status to the grandmother of the dependent children. The grandmother had engaged in conduct that the court viewed as being " 'fundamentally at odds with the role of a parent,' " including kidnapping the children and keeping them in hiding from the social services agency and allowing an abusing parent access to them. (*Id.* at p. 158.) The appellate court observed that " '[w]hen a nonparent caretaker commits "*a substantial harm*" to the child, a harm that is fundamentally at odds with the role of a parent, that person's protectible interest in dispositional decisions is extinguished, including whatever right he might otherwise have had to de facto parent status.' " (*Ibid.*)

Here, the court acknowledged that *Michael R.* was "not exactly spot-on in terms of our case," but the court viewed it as being "parallel," in that the grandmother in *Michael R.* met many of the criteria for de facto parent status but was denied that status because she had behaved in a way that was "contradictory to the parental role." Applying that reasoning, the court denied Martha de facto parent status because it viewed her conduct that negatively influenced the children's attitude toward Ramon and visitation as inconsistent with a parental role.

We find no fault with the court's reasoning. As the California Supreme Court stated, "the key to the privileged status of de facto parenthood is adherence to 'the role of parent,' both physical and psychological." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 78.) Although to a great extent Martha had assumed a parental role with the children, the court essentially found she had acted contrary to that role by persistently engaging in conduct that was detrimental to the children because it undermined their relationship with Ramon and the statutory goal of reunification.

There was substantial evidence to support that finding. Based on Martha's history of uncooperativeness regarding the children's visitation with Ramon, the Agency reasonably

23

concluded that Martha had made up her mind Ramon was not a fit father and would never change, and that she influenced the children to adopt the same view. The children's and Martha's testimony at the hearing on Ramon's section 388 petitions further supported the finding that Martha had negatively influenced the children. Although their testimony showed that the Ramon's telephone calls to the children had not gone well because the children resisted Ramon's efforts to engage them in conversation, all three essentially testified that the calls had to go well before the children would be willing to visit Ramon in person. Based on the totality of the evidence, the court reasonably found that Martha's involvement as the children's caretaker represented "a significant impediment towards successful reunification between these children and their father," and that by influencing the children to refuse visitation, Martha had acted contrary to the role of a parent. Accordingly, the court did not abuse its discretion in denying Martha's application for de facto parent status.

## DISPOSITION

The orders granting Ramon's section 388 petitions are affirmed. The order denying Martha's application for de facto parent status is affirmed.

O'ROURKE, J.

I CONCUR:

BENKE, Acting P. J.

I CONCUR IN THE RESULT:

HUFFMAN, J.

24